Rod Pacheco, Esq. (State Bar No. 112432)
Brian Neach, Esq. (State Bar No. 242801)
Eric J. Fromme (State Bar No. 193517)
PACHECO & NEACH PC
Three Park Plaza, Suite 120
Irvine, California 92614
Telephone: 714.462.1700
Facsimile: 714.462.1785

Attorneys for plaintiff KHAAZRA MAARANU,
an individual, and nominal defendant
ELECTRONIC COMMERCE, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| KHAAZRA MAARANU, an individual,<br><br>   Plaintiff,<br><br>  vs.<br><br>ECOMMERCE SAAS, LLC, an Arizona limited liability company; OFI SAAS, LLC, an Arizona limited liability company; 488 CLUB, LLC, an Arizona limited liability company; JOHN LAKATOS, an individual; JOSEPH DALY, an individual, MICHAEL CARNAVELE, an individual, TYLER NEUROTH, an individual;; and Does 1-100, inclusive,<br><br>   Defendants, AND<br><br>ELECTRONIC COMMERCE, LLC, a Delaware limited liability company,<br><br>   Nominal Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br>**(1) FRAUD**<br>**(2) INENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**(3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**<br>**(4) BREACH OF FIDUCIARY DUTY**<br>**(5) CONVERSION; AND**<br>**(6) UNFAIR COMPETITION UNDER BUSINESS AND PROFESSIONS CODE § 17200**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff Khaazra Maaranu ("Plaintiff") derivatively on behalf of Electronic Commerce LLC ("Electronic Commerce" together with Plaintiff, "Plaintiffs"), and in his individual capacity, alleges against Defendants Ecommerce SAAS, LLC, an Arizona limited liability company ("Ecommerce SAAS"), OFI SAAS, LLC, an Arizona limited liability company ("OFI SAAS"), 488 Club, LLC, an Arizona limited liability company ("488 Club"), John Lakatos, an individual ("Lakatos") ,Joseph Daly, an individual ("Daly"), Michael Carnavele, an individual ("Carnavele"), Tyler Neuroth, an individual ("Neuroth") and Does 1-100, inclusive (collectively, "Defendants"), as follows:

## PARTIES

1.      Plaintiff is an individual who resides in the County of Orange and the State of Florida.  At all times relevant herein, Plaintiff is an owner of 50% of nominal defendant Electronic Commerce.  Plaintiff brings this action pursuant to and California Corporations Code § 17709.2.

2.      As a current owner of 50% of the membership interests of Electronic Commerce during the period the wrongs alleged herein, Plaintiff has standing to assert these claims on behalf of Electronic Commerce and will fairly and adequately protect the interests of Electronic Commerce and its members.

3.      Nominal defendant Electronic Commerce is, at all relevant times hereto, a limited liability company formed under the laws of the State of Delaware with its principal place of business in Orange County, State of California.

4.      Defendant Ecommerce SAAS is, and at all relevant times herein, is an Arizona limited liability company. Ecommerce SAAS is registered to do business as a foreign entity in the State and California, and at all relevant times, its principal place of business was in the County of Orange.

5.      Defendant OFI SAAS, LLC is, and at all relevant times herein, is an Arizona limited liability company.

6.      Defendant 488 Club, LLC is, and at all relevant times herein, an Arizona limited liability company.

7.      Plaintiff is informed and believes and thereupon alleges that, defendant Lakatos is, and at all times relevant herein, an individual who resides in the County of Los Angeles and the State of California.

8.      Plaintiff is informed and believes and thereupon alleges that, defendant Daly is, and at all relevant times herein, an individual who resides in the County of Orange and the State of California.

9.      Defendant Carnavele is, and at all times relevant herein, an individual who resides in the County of San Diego and the State of California.

10.     Plaintiff is informed and believes and thereupon alleges that, defendant Neuroth is, and at all relevant times herein, an individual who resides in the County of Orange and the State of California.

11.     Plaintiff brings this action derivatively in the right and for the benefit of Electronic Commerce to redress the injuries suffered, and to be suffered, by Electronic Commerce as a direct result of the breach of fiduciary duty, unjust enrichment, interference with contract, interference with economic advantage and fraud alleged herein.

12.     Electronic Commerce is named as a nominal defendant solely in a derivative capacity.

13.     Plaintiff will adequately and fairly represent the interests of Electronic Commerce in enforcing and prosecuting its rights.

14.     Plaintiff is and has continuously been a 50% equal co-owner with Darnell Ponder ("Ponder") of Electronic Commerce's membership units during the wrongful conduct alleged herein.

15.     Plaintiff for many months has sought Ponder's adherence to his fiduciary and contractual duties, including a cessation of Lakatos and Neuroth, in concert with Ponder, competing with Electronic Commerce, grossly mismanaging Electronic Commerce's relationship with its sponsoring back, and allowing Plaintiff access to Electronic Commerce's premises, email account, operations, and books and records.  Lakatos and Neuroth, on concert with Ponder, however, have ignored Plaintiff's requests and failed and refused to cease the conduct giving rise to the causes of

action alleged herein.  Any request by Plaintiff to Ponder to prosecute the causes of action contained herein would be futile as Ponder is the alleged wrongful actor and would thus not vindicate the rights of Electronic Commerce.

16.     Plaintiff is informed and believes, and based thereon alleges, that because Electronic Commerce is equally owned by Plaintiff and Ponder, with each owing 50%, majority of the members cannot challenge the transactions alleged herein and Ponder is an interested party to the challenged transactions and allegations alleged herein, thus any demand upon Ponder to pursue this Complaint would be futile.  In short, Ponder has a clear and obvious conflict making any demand upon him to prosecute this Complaint futile.

17.     As alleged herein below, Ponder, the equal co-owner, is neither disinterested nor independent with respect to the acts complained of and there is substantial doubt that those acts were not the product of a valid exercise of business judgment.  Ponder wields total power over Electronic Commerce and is involved in all the wrongdoing alleged herein. Finally, the facts and circumstances of the improper transactions themselves demonstrate that they are likely not the result of the valid exercise of business judgment.

18.     Doe 1 is the trustee of the 488 Marque Trust.  Based on the information presently known to Plaintiff, 488 Marque Trust is the sole member and manager of both Defendant Ecommerce SAAS and OFI SAAS.

19.     The true names and capacities, whether individual, plural, corporate, partnership or otherwise, of Does 2 through 100, inclusive is unknown to Plaintiff who therefore sues said defendants by such fictitious names. The full extent of the facts linking such fictitiously sued defendants is unknown to Plaintiff. Plaintiff is informed, believes, and thereon alleges, that each of the defendants designated herein as Doe was and is negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to and thereby negligent, or in some other actionable manner, legally and proximately caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of Court to amend this Complaint to show the defendants' true names and capacities after the same has been ascertained.

**JURISDICTION AND VENUE**

20.    Plaintiff is informed and believes, and based thereon alleges, that jurisdiction and venue is proper in the Federal District Court for the Central District of California pursuant to 28 U.S.C. § 1332 because Plaintiff resides in the State of Florida, each individual Defendant resides in the state of California, nominal Defendant Ecommerce is a Delaware limited liability company with its principal place of business Newport Beach, California, Defendant 488 Club is an Arizona limited liability company, and Defendant Ecommerce SAAS and OFI SAAS is Arizona limited liability companies with their principal place of business in Newport Beach, California.

**GENERAL ALLEGATIONS**

21.    On January 7, 2011, Plaintiff formed Electronic Commerce LLC as a Florida limited liability company.

22.    Soon thereafter, on May 3, 2001, Plaintiff filed Articles of Amendment with the Florida Secretary of State identifying Plaintiff and Ponder as the sole managing members of Electronic Commerce LLC, a Florida limited liability company.

23.    Plaintiff formed Electronic Commerce for the purpose of engaging in the credit card processing and electronic commerce service business.

24.    Electronic Commerce is an independent sales organization.  An independent sales organization is a third-party organization representing a bank or other financial institution that sells and promotes its credit card processing services to businesses (referred to as "merchants"), one of which is merchant accounts. A business needs a merchant account to accept credit card payments from customers for purchases of its goods and services.

25.    An independent sales organization sets up partnerships with various banks to find, open and manage merchant accounts on behalf of the banks it represents. The independent sales organization reaches an agreement with banks that is properly licensed and will partner with and back the independent sales organization. The bank backing an independent sales organization is referred to as a "sponsoring bank."  The agreement between the independent sales organization and the sponsoring bank allows the independent sales organization to act as a representative of the

sponsoring bank, and the card associations - Visa, Mastercard, American Express, and Discovery (the "Cards Brands"), with which the sponsoring bank has agreements.

26. Under the agreements between the sponsoring bank and the Card Brands, the sponsoring bank remains responsible for the conduct of its independent sales organizations and the resulting merchant relationships. Thus, in addition to requiring the independent sales organization to conduct its business activities in compliance with rules set by the Card Brand's, the sponsoring bank's agreement with the independent sales organization routinely sets forth merchant underwriting guidelines and specifies the type of merchants that the sponsoring bank is willing to work with by enumerating "accepted" merchant categories and "prohibited" and/or "restricted" merchant categories.

27. Some businesses present a higher risk of exposure to sponsoring banks than other businesses. Thus, the Card Brands and the sponsoring banks classify certain merchant categories as "high risk." They also require that the referring organization accurately classify and categorize the merchants they refer based on the merchant's business activities and products or services being sold by assigning it a four-digit number known as a merchant category code ("MCC").

28. "High risk" merchant category codes are applied to industries that generate the highest levels of cardholder disputes, chargebacks, fraud, and represent higher levels of financial risk to the banks and/or create additional brand risk for regulatory reasons.

29. To address the risk of associated with cardholder disputes, chargebacks and fraud, the sponsoring bank" requires the independent sales organization to hold a certain amount of funds in reserve account at the sponsoring bank to cover chargebacks by the customers of merchants and credit card fraud.  The independent sales organization in turn determines the amount of the reserves necessary for each merchant which is held at the sponsoring bank in a merchant reserve account and the amount of the reserve may be adjusted based on the chargeback history and total amount of charges made by the merchant.

30. In addition, sponsoring banks have policies prohibiting or limiting service to certain "high risk' merchant categories.

31.     Independent sales organizations routinely contract with independent contractor sales agents to solicit merchants for referral to the sponsoring bank. "Sales Agents" commonly assist prospective merchants in completing the merchant application and agreement for presentation by the independent sales organization to the sponsoring bank for approval.  The independent sales organization compensates the sales agent for these services by paying the sales agent a contractually agreed upon percentage of the independent sales organization's residuals.

32.     Electronic Commerce also contracts with independent contractor sales agents to identify and sign-up new merchants with Electronic Commerce.

33.     On or about April 24, 2017, Electronic Commerce and Commercial Bank of California ("CBCal") entered a Merchant Marketing and Processing Agreement (the "MMPA"). contract with which sets for the terms of their business relationship including the types of merchants that Electronic Commerce can enter into service agreements on behalf of CBCal.

34.     In addition to requiring Electronic Commerce to conduct its business activities in compliance with Card Brand rules, the MMPA requires Electronic Commerce to send all merchant information to CBCal for risk evaluation and possible underwriting. The MMPA also specifies "restricted" and "prohibited" merchant categories.

35.     The MMPA requires Electronic Commerce to establish and maintain at CBCal a merchant settlement account int which all deposits flow from all merchant processing activity from Electronic Commerce, and a reserve account.  The required amount for the reserve account under the MMPA is based on an analysis of numerous factors, including Electronic Commerce's financial stability and performance, which includes the number of chargebacks and fraud claims Electronic Commerce's merchant portfolio generates.  The reserve account is intended to ensure that there are always sufficient funds on deposit with the CBCal to cover Electronic Commerce's anticipated liabilities.

36.     The MMPA also requires Electronic Commerce to maintain merchant reserve accounts to ensure that there are sufficient funds on deposit to cover the merchant's anticipated liabilities.

37.     Since entering the MMPA, Electronic Commerce has represented and continues to represent CBCal as an independent sales organization, by finding, opening, and managing merchant accounts and providing the merchants credit card processing services.

38.     CBCal may request Electronic Commerce to increase from time to time the amount of the reserve account or a particular merchant reserve account based on the chargeback history, fraud activity and total amount of charges for a merchant.

39.     CBCal also has the right under the MMPA to require Electronic Commerce to cancel and otherwise terminate a service agreement with a particular merchant based on, among other things, chargeback and fraud claims exceeding the amount CBCal agreed to accept.

40.     Since Electronic Commerce's inception, while Plaintiff and Ponder operated Electronic Commerce equally with each taking a hand in operating the business, running the "back office" of the business that supported the merchants that contracted with Electronic Commerce, and, since at least 2017, maintaining Electronic Commerce's relationship with CBCal.

41.     From Electronic Commerce's beginnings, however, Plaintiff was the fundamental part of the sales side of Electronic Commerce's business and was the primary source of Electronic Commerce's clients while also providing customer service, technical support and working operations.  Initially, Electronic Commerce was an independent sales agent referring merchants to credit card processors, but it eventually evolved to become a full-service provider of credit card processing services that it is today.

42.     For many years, while Plaintiff traveled the country signing up new merchants with Electronic Commerce, he also regularly visited Electronic Commerce's offices in California.

43.     Plaintiff and Ponder were close friends for many years, often vacationing together.  Ponder was also the best man at Plaintiff's wedding.

44.     In or around early 2018, Ponder, decided, and proposed to Plaintiff to change Electronic Commerce from a Florida limited liability company to one organized under the laws of the State of Delaware.

45.     On or about October 23, 2018, Electronic Commerce was formed as a Delaware limited liability company.

46.     On or about January 24, 2019, Articles of Dissolution were filed with the Florida Secretary of State dissolving Electronic Commerce LLC as a Florida limited liability company identifying that the "Entity was incorporated in a foreign state."

47.     On or about May 9, 2019, Ponder and Plaintiff signed the Limited Liability Company Agreement of Electronic Commerce LLC, a Limited Liability Company v2.0 (the "LLC Agreement").  Attached hereto as **Exhibit A** is a true and correct copy of the LLC Agreement.

48.     The LLC Agreement "supersedes any and all agreements and is the newest version". [Ex. A., p.14]

49.     Pursuant to the LLC Agreement, Ponder and Plaintiff is each 50% members of Electronic Commerce.  [Ex. A. Sec. III.A., at p. 2.].

50.     Ponder and Plaintiff each have equal voting power as they each is equal members of Electronic Commerce.  [Ex. A. Sec. III. F.1. at p. 4.]

51.     There are no other members of Electronic Commerce other than Ponder and Plaintiff.

52.     Ponder owes fiduciary duties of loyalty and care to Electronic Commerce and agreed to such duties in the LLC Agreement.  [Ex. A. Sec. III. H.1. at p. 5.]

53.     Ponder expressly agreed that he "shall refrain from dealing with [Electronic Commerce] in the conduct of [Electronic Commerce]'s businesses as or on behalf of a party having an interest adverse to [Electronic Commerce] unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto." [Ex. A. Sec. III. H.2. at p. 5.]

54.     Ponder expressly agreed that he "shall refrain from competing with [Electronic Commerce] in the conduct of [Electronic Commerce]'s business unless a majority, by individual vote, of the Members excluding the interested Member, consents thereto. [Ex. A. Sec. III. H.2. at p. 5.]

55.     Ponder has fiduciary duties of disclosure, good faith, and fair dealing to [Electronic Commerce] and to [Plaintiff].  [Ex. A. Sec. III. H.1. at p. 5.]

56.     Officers of Electronic Commerce may only be appointed or removed by an affirmative vote of a majority of the Members of Electronic Commerce. [Ex. A. Sec. VI.A. at page 7.]

57.     Officers of Electronic Commerce "shall have a fiduciary duty of loyalty and care similar to that of officers of limited liability companies organized under the laws of Delaware." [Ex. A. Sec. VI.C.1. at page 9.]

58.     Officers of Electronic Commerce "shall refrain from competing with the Company in the conduct of the Company's business unless a majority, by individual vote, of the Members…consents thereto." [Ex. A. Sec. VI.C.2. at page 9.]

59.     Officers of Electronic "shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company, unless a majority, by individual vote, of the Members…consents thereto." [Ex. A. Sec. VI.C.2. at page 9.]

60.     It was beginning in 2019, unbeknownst to Plaintiff, that the relationship between Ponder and Plaintiff began to change.

61.     Beginning in 2019, without the knowledge or consent of Plaintiff, Ponder began managing the operations of Electronic Commerce exclusively and began "freezing out" Plaintiff from Electronic Commerce's operations and began appointing officers, including Defendants Lakatos and Neuroth, to Electronic Commerce without the knowledge or consent of Plaintiff

62.     Plaintiff is informed and believes, and based thereon alleges, that beginning in 2019, Electronic Commerce, under Ponder's direction and control, and in concert with Defendants Lakatos and Neuroth, began signing up new merchants to Electronic Commerce that had histories of significant chargebacks and credit card fraud.

63.     Plaintiff is informed and believes, and based thereon alleges, that in March 2019, Ponder and Neuroth met with Allyy LLC, an independent sales agent that refers merchants to credit card processors like Electronic Commerce.

64.     Plaintiff is informed and believes, and based thereon alleges, that Allyy has significant nutraceutical merchant referrals and that Ponder and Neuroth expressly stated that they wanted to sign up nutraceutical merchants with Electronic Commerce.

65.     Plaintiff is informed and believes, and based thereon alleges, that nutraceutical merchants is considered high risk because their customers initiate a large number of chargebacks

because they feel the products do to confer the benefit as advertised, and the products is offered on a monthly subscription basis that customers challenge as inadequately disclosed.

66.     Plaintiff is informed and believes, and based thereon alleges, that on or about April 12, 2019, Allyy and Electronic Commerce, without the consent or knowledge of Plaintiff, entered into Independent Sales Agreement where Allyy would refer merchants to Electronic Commerce.

67.     Plaintiff is informed and believes, and based thereon alleges, that the merchant accounts that Allyy presented to and were then serviced by Electronic Commerce had histories of substantial amounts of chargebacks and credit card fraud, which continued at Electronic Commerce and that despite this Ponder and Neuroth requested that Allyy send more nutraceutical merchants to Electronic Commerce.

68.     Plaintiff is informed and believes, and based thereon alleges, that Ponder personally handled more than 90% of Allyy's referrals and that he personally received the merchant applications and supporting documents for Allyy's referrals and keyed them into Electronic Commerce's system himself.

69.     Plaintiff is informed and believes, and based thereon alleges, that Ponder and Neuroth knew that the nutraceutical merchants referred to Electronic Commerce would not meet CBCal's underwriting requirements but caused Electronic Commerce to continue to onboard and process those merchants despite numerous complaints and instructions from CBCal that Electronic Commerce was to stop onboarding the nutraceutical merchants and to close all nutraceutical accounts.

70.     Plaintiff is informed and believes, and based thereon alleges, that Ponder and Neuroth ignored the warnings and demands from CBCal and concealed the communications from CBCal from Plaintiff.

71.     Plaintiff is informed and believes, and based thereon alleges, that when CBCal raised concerns about the new merchants that Electronic Commerce had contracted with Ponder and Neuroth without Plaintiff's knowledge arranged a meeting with CBCal and excluded Plaintiff from participating.

72.     Plaintiff is informed and believes, and based thereon alleges, that on or about May 31, 2019, Ponder and Neuroth set up a meeting with CBCal and Electronic Commerce on behalf of Electronic Commerce and specifically excluded Plaintiff, the equal co-owner of Electronic Commerce, from participating.

73.     Plaintiff is informed and believes, and based thereon alleges, that Ponder Neuroth had many meetings and discussions with CBCal excluding Plaintiff from each of his meetings with CBCal, which included Defendant Lakatos while he was an employee of CBCal and refused and failed to inform Plaintiff of the substance of his meetings and communications with CBCal.

74.     Plaintiff is informed and believes, and based thereon alleges, that Ponder and Neuroth continued, despite CBCal's concerns to cause Electronic Commerce to sign up merchants that resulted in significant chargebacks and credit card fraud jeopardizing Electronic Commerce's relationship with CBCal and damaging Electronic Commerce's reputation in the credit card processing business.

75.     Plaintiff is informed and believes, and based thereon alleges, that that as late as September 2019, despite concerns and objections raised by CBCal, Ponder and Neuroth requested that Ally continue to refer high risk nutraceutical merchants to Electronic Commerce.

76.     On or about August 6, 2019, Daly formed Tangram Payments LLC, a California limited liability company.

77.     Plaintiff is informed and believes, and based thereupon alleges, that a in November 2019 a meeting was held in November of 2019 between representatives of CBCal and purported representatives of "Tangram." Pursuant to a business plan that "Tangram" provided CBCal, Daly was Tangram's Chief Executive Officer. The business plan also identified Hiep Tran and Alan Kleinman as being involved with "Tangram" and identified them as founders of and executives with other payment processing companies. The documents "Tangram" provided CBCal also identified the company's website as "tangrampayments.com." "Tangram," however, never followed through after the meeting and no relationship was ever formed between it and CBCal

78.     Plaintiff is informed and believes, and based thereon alleges, that in or around February 2020, CBCal began emailing Plaintiff, about the substantial chargeback and fraud history

on new merchant accounts, directly as its communications to Electronic Commerce's staff were being ignored at the direction of Ponder and Neuroth.

79.     Once Ponder and Neuroth discovered that Plaintiff had responded to CBCal, Ponder and Neuroth began blocking access and communications to Plaintiff's Electronic Commerce email account at "khaazra@ec-processing.com.  Ponder, Neuroth, and those working at their direction continue to block Plaintiff from accessing his email account.

80.     In or around February 2020, Plaintiff requested information regarding the high risk nutraceutical merchants that had been signed up as merchants at Electronic Commerce by Ponder and Neuroth, and was told that they were addressing CBCal's concerns, and his participation was not required.

81.     Plaintiff is informed and believes, and based thereon alleges, that in late February 2020, Ponder and Neuroth requested that Ally temporarily pause submitting more high-risk nutraceutical merchants to Electronic Commerce, which was reiterated to Ally in March 2020.

82.     Plaintiff is informed and believes, and based thereon alleges, that Lakatos while still an employee of CBCal, began working with Electronic Commerce, or conspiring with Ponder assisting him in signing up new nutraceutical merchants.

83.     On April 13, 2020, Ponder signed and caused to be filed with the California Secretary of State, on behalf of Electronic Commerce, the Application to Register a Foreign Limited Liability Company.

84.     Plaintiff is informed and believes, and based thereon alleges, that on April 24, 2020, Electronic Commerce notified Ally that it would be closing a large number of nutraceutical merchant accounts based on an audit by Visa and CBCal that revealed a high amount of fraud ratios.

85.     Plaintiff is informed and believes, and based thereon alleges, that on or about April 30, 2020, CBCal required Electronic Commerce to terminate the agreements with all merchants in the Nutraceutical industry because these merchants' chargeback and fraud claims had exceeded the limits provided for in Electronic Commerce's contract with CBCal and the Card Brands had given notice of concerns about excessive chargebacks.

86.     Plaintiff is informed and believes, and based thereon alleges, that because Ponder and Neuroth had continued to enter into contracts with merchants that had substantial chargeback and fraud claims, CBCal began to require Electronic Commerce to terminate contracts with other merchants negatively impacting those merchants but also Electronic Commerce's business.

87.     Plaintiff is informed and believes, and based thereon alleges, that Ponder and Neuroth knowingly made false statements to CBCal when signing merchants that were high risk knowing that they did meet CBCal's underwriting requirements, were on CBCal's restricted list, or historically had large amounts of chargebacks or fraud claims.

88.     Plaintiff is informed and believes, and based thereon alleges, that even after the account closures, Ponder and Neuroth, with the assistance of Lakatos, submitted merchant accounts in Ally's portfolio to another processor and got them approved.

89.     Plaintiff is informed and believes, and based thereon alleges, that in or around April 2020, Ponder, without Plaintiff's knowledge or consent, caused Electronic Commerce to hire a former employee of CBCal, Lakatos, and soon after appointed Lakatos as an officer of Electronic Commerce with a significant monthly salary of about $30,000.

90.     Plaintiff is informed and believes, and based thereon alleges, that Ponder, Neuroth and Lakatos, continued to cause Electronic Commerce to sign up merchants that did not meet CBCal's underwriting requirements and exceeded CBCal's volume limits, chargeback limits and fraud claims, and that CBCal, upon discovery, would cause Electronic Commerce to terminate the merchant accounts.

91.     Plaintiff is informed and believes, and based thereon alleges, that in or around May 2020, Ponder, without the consent of Plaintiff, appointed Allan LaCoste as an officer of Electronic Commerce while he was also an officer of Nuvei.

92.     Plaintiff is informed and believes, and based thereon alleges, that Nuvei is an independent service organization providing credit card payment services to merchants.

93.     Plaintiff is informed and believes, and based thereon alleges, that during mid-2020, Alan LaCoste worked out of the offices of Electronic Commerce each Monday and directed the staff and employees of Electronic Commerce.

94.     Plaintiff is informed and believes, and based thereon alleges, that Ponder, Neuroth and Lakatos directed employees of Electronic Commerce to provide Allan LaCoste confidential information relating to the operations of Electronic Commerce, including transaction reports, chargeback reports, and merchant reports.

95.     Plaintiff is informed and believes, and based thereon alleges, that Ponder, Neuroth and Lakatos put Allan LaCoste on Electronic Commerce organizational chart identifying him as an officer of Electronic Commerce.

96.     Plaintiff is informed and believes, and based thereon alleges, that Alan LaCoste, with Ponder, Lakatos and Neuroth, participated in meeting and phone calls with potential sponsor banks for Electronic Commerce, including BBVA bank and The Bancorp Bank, identifying himself with a different name as the new chief executive officer of Electronic Commerce.

97.     Plaintiff is informed and believes, and based thereon alleges, that Ponder, and Allan LaCoste met with CBCal where they presented a proposal to CBCal would refer higher risk merchants to Electronic Commerce for credit card processing with CBCal.

98.     On or about May 22, 2020, Electronic Commerce paid $12,500 directly to Allan LaCoste while he was an officer of Nuvei.

99.     On or about June 24, 2020, Electronic Commerce PAID $12,500 directly to Allan LaCoste while he was an officer of Nuvei.

100.     In or around May 2020, CBCal began including Plaintiff in email communications relating to Electronic Commerce using Plaintiff's alternative email address.

101.     In or around May 2020, Plaintiff requested information as to how CBCal's concerns about "high risk" merchants and excessive chargebacks were being addressed, and was told by Ponder, Neuroth and others working under their supervision that the issues were being resolved and he need not worry.

102.     In or around June 2020, Plaintiff requested information on the role of Allan Lacoste and John Lakatos and the amounts they were being paid and was told by Ponder, Lakatos and Neuroth and others that Ponder needed help in operating Electronic Commerce and that he need not be concerned about operations.

103. Plaintiff is informed and believes, and based thereon alleges, that in or about June 2020, Ponder, Lakatos and Neuroth caused Electronic Commerce to pay $250,000 to Merchant Kings, http://merchantkings.com.

104. Plaintiff is informed and believes, and based thereon alleges, that Merchant Kings is a Sales Agent that contracted with Nuvei.

105. Plaintiff is informed and believes, and based thereon alleges, that in or about June 2020, Electronic Commerce boarded a large number of merchant accounts that were either previously at Nuvei or had applied for merchant services at Nuvei that were referred to Nuvei by Merchant Kings.

106. Plaintiff is informed and believes, and based thereon alleges, that Electronic Commerce made payments to Merchant Kings by wire transfer and by using Electronic Commerce credit cards.

107. In or around July 2020, Ponder presented an offer to Plaintiff in which Plaintiff would reduce his 50% ownership interest in Electronic Commerce to 10% to allow Lakatos and Allan Lacoste to have an ownership interest in Electronic Commerce.  Ponder told Plaintiff that if he did not accept this offer to reduce his ownership interest in Electronic Commerce, Ponder he would dwindle Electronic Commerce's assets to zero. Plaintiff refused the offer.

108. In or around July 2020, Ponder, Lakatos, Neuroth and others at the direction of each of them blocked Plaintiff's access to Electronic Commerce's ADP payroll account, First Data account (the processing platform) and Access One account.

109. Plaintiff is informed and believes, and based thereon alleges, that in or around July 2020, Ponder, Lakatos and Neuroth changed the terms and conditions for Electronic Commerce's merchants to include an "inactivity fee" charging merchants 1% fee based of their proposed volume regardless of whether the merchant processed the proposed volume.

110. Plaintiff is informed and believes, and based thereon alleges, that the inactivity fee was not agreed to by merchants and is not in compliance with the Card Brand and CBCal policies.

111. Plaintiff is informed and believes, and based thereon alleges, that in or around July 2020, Ponder, Lakatos, Neuroth and others began sending Electronic Commerce confidential

information to prospective sponsoring banks, including BBVA and The Bancorp Bank and caused Electronic Commerce to make payments to these banks.

112. Plaintiff is informed and believes, and based thereon alleges, that that Ponder, Lakatos and Neuroth caused Electronic Commerce to make significant payments to third parties that Plaintiff had no knowledge of, and that Electronic Commerce did not receive value in return for the payments.

113. Plaintiff is informed and believes, and based thereon alleges, that beginning in or around July 2020, Ponder, Lakatos and Neuroth directing employees of Electronic Commerce to not communicate with Plaintiff.

114. Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth were ignoring CBCal's communications concerning merchants that had exceeding the bank's volume limits, chargeback limits and fraud claims.

115. Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth knowingly caused Electronic Commerce to contract with merchants that were not permitted under CBCal's policies and its contract with Electronic Commerce.

116. Plaintiff is informed and believes, and based thereon alleges, that rather than address CBCal's concerns, Ponder, Lakatos and Neuroth attempted to work around CBCal's policies and contractual requirements and "out slick" CBCal, all without Plaintiff's knowledge and specially excluding Plaintiff from addressing CBCal's concerns.

117. Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth caused Electronic Commerce to sign up, from another credit card processor that was in receivership, merchants with histories of substantial chargebacks and creditor card fraud claims.

118. Plaintiff is further informed and believes, and based thereon alleges, that in or around June 2020, Ponder, Lakatos and Neuroth without Plaintiff's knowledge or consent, caused Electronic Commerce to obtain a federal government "Paycheck Protection Program" loan and Plaintiff has never been informed on how the proceeds of the loan were used.

119. Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth caused Electronic Commerce to file lawsuits against merchants without Plaintiff's

knowledge or consent, and that Electronic Commerce had been sued by merchants, but Plaintiff had no knowledge of the lawsuits because Ponder had turned off Plaintiff's Electronic Commerce email account and otherwise prevented Plaintiff from obtaining information about the lawsuits.

120.    Plaintiff is informed and believes, and based thereon alleges, that Ponder directed Electronic Commerce's legal counsel, Venable LLP, to not provide Plaintiff legal invoices and other information regarding Venable's representation of Electronic Commerce.

121.    Ponder, Lakatos and Neuroth prevented and otherwise blocked Plaintiff from accessing Electronic Commerce's books and records, computer systems and computer files. Plaintiff is informed and believes, and based thereon alleges, that Ponder appointed Neuroth as an officer of Electronic Commerce and instructed Neuroth and other staff to not communicate with Plaintiff.

122.    Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth prevented Plaintiff from accessing or using the customer relationship management system at Electronic Commerce impairing Plaintiff's ability to bring new merchants to Electronic Commerce.

123.    Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth prevented Plaintiff from signing up new merchant accounts with Electronic Commerce.

124.    Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth has prevented and otherwise blocked Plaintiff from communicating with Electronic Commerce employees or persons working on behalf of Electronic Commerce and has directed Electronic Commerce employees and staff to ignore Plaintiff and his requests.

125.    Plaintiff is informed and believes, and based thereon alleges, that beginning in or around April 2020 and continuing through about February 2021, Ponder, Neuroth and others directed on numerous occasions that one Electronic Commerce's merchants, Diamond Digital Marketing LLC dba Audien Hearing, to open up new merchant accounts under another LLC name. Plaintiff is further informed and believes, and based thereon alleges, that Ponder, Neuroth and others specifically and repeated they told Audien Hearing to open new accounts that it was proper to do this, it would not cause any problems and was compliant with credit card processing norms.

126.    Plaintiff is further informed and believes, and based thereon alleges, that in or around June 2020 Ponder, Lakatos and Neuroth blocked or otherwise "turned off" Plaintiff's access to Electronic Commerce's payroll system, including representing to the payroll provider that Ponder was the sole owner of Electronic Commerce, to conceal from Plaintiff the exorbitant amounts Electronic Commerce was paying officers, including Lakatos, Neuroth and Allan Lacoste.

127.    Plaintiff is further informed and believes, and based thereon alleges, that to conceal from Plaintiff the amounts Electronic Commerce was paying officers such as Allan Lacoste and John Lakatos Ponder, Lakatos and Neuroth paid officers from Electronic Commerce's operating accounts.

128.    Plaintiff is further informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth are causing Electronic Commerce to pay exorbitant salaries and commissions to officers and employees of Electronic Commerce.

129.    Plaintiff is further informed and believes, and based thereon alleges, that in or around September 2020, Ponder, without the knowledge or consent of Plaintiff, appointed Daly as an officer of Electronic Commerce with a $20,000 monthly salary and commissions that far exceeded industry norms.

130.    Plaintiff is further informed and believes, and based thereon alleges, that Daly was and remains a partner and officer of Capri Payments, a competitor of Electronic Commerce, and that Daly conducted operations of Capri Payments at Electronic Commerce's offices.

131.    Ponder appointed Daly and hired others despite Plaintiff's specific and express direction that Ponder not hire highly compensated employees or appoint officers without his express consent and agreement.

132.    On October 21, 2020, Defendant Daly canceled Tangram Payments, LLC with the California Secretary of State, the entity he presented to CBCal in November 2019.

133.    On April 6, 2021, Daly created another California limited liability company, again named Tangram Payments LLC.

134.    On April 13, 2021, Tangram Payments LLC filed a fictitious business statement with the County of Orange to do business as "Tangram."

135.     Then, on May 14, 2021, Daly canceled Tangram Payments LLC with the California Secretary of State again.

136.     Defendants, however, were operating, and continue to operation Tangram as a payment processing company from the 4100 Newport Place Drive address at which both Electronic Commerce and Ecommerce SAAS are also supposedly located, and Ponder has admitted, Ecommerce SAAS, through 488 Marque Trust, that is doing business as Tangram. In fact, on June 1, 2021, the Newport Beach Chamber of Commerce posted a photograph to its Facebook page welcoming its "new member," Tangram Payments. The photograph shows Ponder, Lakatos, Neuroth, with others, standing in Tangram's lobby. Furthermore, the current company website is "tangrampayments.com," the same website address as contained in the business plan Daly submitted to CBCal for Tangram in November of 2019.

137.     Plaintiff is further informed and believes, and based thereon alleges, that in or around September 2020, Electronic Commerce, under Ponder's, Lakatos' and Neuroth's control, continued to contract with merchants that exceed CBCal's volume, chargeback and fraud limits resulting in CBCal requiring the termination of merchant contracts and fines.

138.     Plaintiff is informed and believes, and based thereon alleges, that on or about November 21, 2019, Carnevale formed Beyond Patriots LLC in the State of New Jersey.

139.     Plaintiff is informed and believes, and based thereon alleges, that on March 20, 2021, Carnevale formed MCMG Group LLC with the State of New Jersey with the same address, except for the box number, as Beyond Patriots LLC.  Plaintiff is further informed and believes, and based thereon alleges, that that MCMG Group LLC does business as Red Freedom Market.

140.     Plaintiff is informed and believes, and based thereon alleges, that on September 18, 2020, Carnevale formed Liberty Productions LLC in the state of California.

141.     Plaintiff is informed and believes, and based thereon alleges, that November 4, 2020, Carnevale formed VVV Projects LLC in the state of Arizona.

142.     Plaintiff is informed and believes, and based thereon alleges, that Liberty Productions does business as USA Liberty Shop, which has received a number of complaints for fraudulent credit card charges.

143.     On December 1, 2020, 488 Club LLC, an Arizona limited liability company was formed with Ponder, Lakatos and Carnavele identified as the principals.

144.     Plaintiff is informed and believes and based thereon alleges that Beyond Patriots, USA Liberty Shop, and Veteran Support Now are all merchants who processed card charges through Electronic Commerce whose accounts CBCal ordered closed due to excessive fraud and chargebacks.

145.     Plaintiff is informed and believes and based thereon alleges that Red Freedom Market has charged more than 11,000 cards previously charged by Veteran Support Now, over 6,700 cards previously charged by Beyond Patriots, and over 10,000 cards previously charged by USA Liberty Shop.

146.     Plaintiff is informed and believes and based thereon alleges that Red Freedom Market, Veteran Support Now, Beyond Patriots, and USA Liberty Shop is entities being used to process fraudulent transactions through Electronic Commerce as part of the conspiracy, alleged herein, and through which Ponder, Lakatos, Neuroth, Daly and Carnavele are funneling funds to Tangram.

147.     Plaintiff is informed and believes and based thereon alleges that Ponder and Lakatos have been embezzling funds from Electronic Commerce through the creation of fraudulent accounts and phony transactions intended to disguise the theft, and that Defendants have been laundering the stolen funds through other entities with the assistance of Carnevale, who is a member on 488 Club LLC with Ponder and Lakatos.

148.     On or about September 23, 2021, CBCal sent a letter to Electronic Commerce addressed to Ponder as Chief Managing Officer demanding compliance with Commercial Banks policies and the Processing Agreement ("Non-compliance Letter").

149.     The Non-compliance letter stated CBCal's "grave concern" that Electronic Commerce had "evidenced a continued pattern and practice of boarding merchants that have been declined for processing by Commercial Bank of California, then processing transactions from those merchants using CBC's BIN/ICA." CBCal also stated: "Moreover, when directed by CBC

PACHECO & NEACH PC
P&N

associates to terminate the declined merchants, Electronic Commerce has failed to close most of those merchants in a timely manner, and in some cases has yet to close them at all."

150.    The Non-compliance Letter stated further: "This behavior is unacceptable and must cease at once. While it seems absurd to reference a provision in our Agreement to point out that boarding declined merchants is a default, §7.2 comes to mind. There may be others. Nevertheless, it is also a violation of Card Association Rules. You are directed to close all merchants on the attached list within 15 days from the date of this letter and notify the Bank immediately upon complying. Failure to do so within the required cure period will result in referral of this matter to outside counsel and an examination of all remedies available to the Bank, including but not limited to termination of sponsorship."

151.    CBCal also addressed Electronic Commerce's repeated and ongoing failure to respond to communications from CBCal's employees, stating: "Additionally, failure to reply to ongoing communications from Bank staff regarding operational matters within a reasonably timely fashion will also result in immediate escalation to outside counsel, and examination/exercise of remedies."

152.    CBCal further instructed Electronic Commerce to "implement controls sufficient to ensure that no merchants are boarded which is declined for processing by CBC, and to close declined merchants who were boarded immediately upon discovery by Electronic Commerce or notification by CBC."

153.    On or about October 8, 2020, Ponder responded to CBCal, without including, consenting with, or otherwise conferring with me. Ponder denied the assertions of CBCal and then asserted that Electronic Commerce would seek to transfer its business to another sponsoring bank.

154.    Plaintiff is further informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth nonetheless, ignored CBCal's requests continuing to enter into contracts with merchants that had substantial chargeback and fraud claims.

155.    Plaintiff is informed and believes, and based thereon alleges, that knowing CBCal's concerns about compliance with the MMPA, in or about October 2020, Ponder, Lakatos and Neuroth knowingly, without the knowledge or consent of Plaintiff, signed up "RagingBull.com" as a new

merchant despite the fact that the amount of volume processed by Ragingbull.com substantially exceeded the volume limits with CBCal and the fact that RaginBull.com was facing a complaint by the Federal Trade Commission for fraud seeking $137 million damages.

156. Plaintiff is informed and believes, and based thereon alleges, that the RagingBull.com account resulted in about $400,000 in chargebacks, other losses by Electronic Commerce, and further complaints by CBCal about non-compliance with the MMPA. Plaintiff is further informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth ignored the complaints and questions from CBCal and directed Electronic Commerce staff members to not respond to Commercial Bank's inquiries.

157. Plaintiff is informed and believes, and based thereon alleges, that continuing in October 2020, Electronic Commerce, under Ponder's, Lakatos' and Neuroth's control, Electronic Commerce was contracting with merchants that were on CBCal's "restricted list".

158. In or about November 2020, Plaintiff, through counsel, made a request to inspect Electronic Commerce's books and records, and a demand for mediation under the terms of the LLC Agreement.

159. Plaintiff is further informed and believes, and based thereon alleges, that in response to the request inspect the books and records, Ponder, Lakatos and Neuroth terminated Plaintiff's access to Electronic Commerce's credit card accounts to conceal information regarding Electronic Commerce's expenses, payments, and general finances from Plaintiff.

160. Plaintiff did not receive the information, documents and access to Electronic Commerce's books and records to which he is entitled as a co-equal member of Electronic Commerce.

161. Plaintiff is informed and believes, and thereon alleges, that Ponder, Lakatos and Neuroth has prevented any of Electronic Commerce's financial reports, including profit and loss, balance sheets and financial statements, from being sent to Plaintiff, and that Electronic Commerce has not in recent years filed its federal and state tax returns.

162. Plaintiff is further informed and believes, and based thereon alleges, that in or around November 2020, Electronic Commerce, at Ponder's, Lakatos' and Neuroth's direction, continued to

make payments to Merchant Kings despite Plaintiff's request that payments to Merchant Kings cease.

163.    Plaintiff is informed and believes, and based thereon alleges, that in or around November 2020, Electronic Commerce, at Ponder's, Lakatos' and Neuroth's direction and without the consent or knowledge of Plaintiff, began making significant changes to the terms and conditions of Electronic Commerce's merchant contract, including adding an excessive termination fee.

164.    Plaintiff is further informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth would sign "high risk" merchants with the knowledge and expectation that CBCal would soon discovery that the merchants did not meet its underwriting requirements and require Electronic Commerce to terminate the merchant contract which in turn would entitle Electronic Commerce to the newly increased termination fee.

165.    On or about November 17, 2020, less than 1 month after Daly cancelled Tangram Payments LLC, Ecommerce SAAS LLC doing business as Tangram ("Tangram") was formed under the laws of the State of Arizona identifying 488 Marque Trust as the sole owner.

166.    Lakatos signed a declaration under penalty of perjury that he, Ponder, and Joe Daly is the ultimate owners of "Tangram Payments."

167.    Ponder signed a declaration under penalty of perjury that Ecommerce SAAS LLC does business as "Tangram Payments".

168.    Plaintiff is further informed and believes, and based thereon alleges, that Tangram is a credit card processor and competitor of Electronic Commerce.

169.    Plaintiff is informed and believes, and based thereon alleges, that since about November 2020, Ponder has been and remains the Chief Managing Officer of Tangram, Daly has been and remains an officer of Tangram, Lakatos has been and remains the Chief Revenue Officer of Tangram, Neuroth has been and remains the Chief Operating Officer of Tangram.

170.    For many years Electronic Commerce's principal place of business and headquarters was located at 1 City Blvd W Ste. 1850, Orange, California.

171.    In or about November 2020, Defendants moved Electronic Commerce's place of operations and headquarters to 4100 Newport Place Drive, Suite 500, Newport Beach California by

entering a seven-year lease at about $35,000 per month without ever discussing the move or the new lease with Plaintiff, the co-equal member of Electronic Commerce, and without obtaining his consent.

172.     Plaintiff is informed and believes, and based thereon alleges, that Defendants caused Electronic Commerce to spend substantial amounts of money purchasing new office equipment, furniture, and tenant improvements for Electronic Commerce's new office space.

173.     Plaintiff is informed and believes, and based thereon alleges, that since moving Electronic Commerce to the new location, Defendants have refused to grant Plaintiff access to the Electronic Commerce's offices and has affirmatively prevented Plaintiff from entering or accessing the Electronic Commerce's offices.

174.     Plaintiff is informed and believes, and based thereon alleges, that Tangram operates its business directly competing with Electronic Commerce at Electronic Commerce's newly leased premises.

175.     Plaintiff, a co-equal member and 50% owner of Electronic Commerce does not have access to the Electronic Commerce's offices and does not have a key or other security access to the Electronic Commerce's offices.

176.     In December 2020, Plaintiff was denied access into Electronic Commerce's offices by Ponder, Lakatos, Neuroth and others.

177.     In December 2020, Plaintiff and Ponder participated in a mediation that did not result in a resolution, in part, because Ponder failed and refused to provide Plaintiff access to Electronic Commerce's books and records so that he could evaluate offers.

178.     Plaintiff is informed and believes, and based thereon alleges, that the mediation failed because Ponder and Defendants had already put in place an orchestrated scheme to deplete the assets of Electronic Commerce, cause the termination of the MMPA, and transfer Electronic Commerce's assets, employees, and merchants to Tangram.

179.     Plaintiff is informed and believes, and based thereon alleges, that in early 2021 Ponder purportedly appointed himself as the "Chief Executive Officer" of Electronic Commerce,

without the consent of Plaintiff, and presented himself to CBCal, merchants, new prospective sponsoring banks, and others as the Chief Executive Officer of Electronic Commerce.

180.  On December 8, 2020, OFI SAAS, LLC, an Arizona limited liability company was formed with 488 Marque Trust as the sole member.

181.  Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Joe Daly is the ultimate owners of OFI SAAS, LLC.

182.  488 Marque Trust is the sole member of OFI SAAS and Ecommerce SAAS, which Plaintiff is informed and believes, and based thereon alleges, is operating as Tangram.

183.  On December 15, 2020, an unsigned Statement of Information was filed with the California Secretary of State on behalf of Electronic Commerce identifying Electronic Commerce's business address as "4100 Newport Place Drive, Ste. 500, Newport Beach, California."

184.  On or about February 22, 2021, Tangram registered with the State of California as a foreign limited liability company with its principal place of business at the 4100 Newport Place Drive, Suite 500, Newport Beach, California.

185.  Plaintiff is informed and believes, and based thereon alleges, that Defendants sought to enter in agreement with The Bancorp Bank as a sponsoring bank.  Plaintiff is further informed and believes, and based thereon alleges, that Defendants presented to Bancorp the operational history of Electronic Commerce, Electronic Commerce's books and records, Electronic Commerce's corporate structure, excluding Plaintiff, and caused Electronic Commerce to pay a fee to Bancorp for the purpose of entering a sponsoring bank agreement with Bancorp, but not for the benefit of Electronic Commerce, but instead for the benefit of Tangram and Defendants.

186.  After Plaintiff rejected Ponder's effort to reduce Plaintiff's ownership in Electronic Commerce from 50% to 10%, in or about February 2021, Ponder presented an offer from Hiep Tran to purchase Electronic Commerce for about $4 million. Plaintiff is informed and believes, and thereon alleges, that Hiep Tran has a personal and business relationship with Daly.  Plaintiff declined the offer.  Plaintiff was unable to evaluate the offer because he did not have access to Electronic Commerce's books and records.

187.    Soon after Plaintiff rejected the offer to purchase Electronic Commerce from Hiep Tran, Ponder drafted a letter of intent and presented it to Plaintiff in which Plaintiff could purchase Electronic Commerce for $2,000 but without any operations.  Ponder gave Plaintiff 24 hours to accept to offer.  Plaintiff declined the offer.

188.    Ponder then presented another offer to Plaintiff in which Plaintiff would hold a minority interest in a new company owned by Ponder, Joe, Lakatos, and Hiep Tran.  Plaintiff declined this offer.

189.    Plaintiff is informed and believes, and based thereon alleges, that in or about March 2020, Ponder assigned the lease for Electronic Commerce's offices to Tangram.

190.    Plaintiff is informed and believes, and based thereon alleges, that in or about March 2020, Ponder, Lakatos, and Neuroth transferred the employees and staff of Electronic Commerce to Tangram.

191.    Plaintiff is informed and believes, and based thereon alleges, that since about March 2020, the independent sales representatives that refer merchants to Electronic Commerce are no longer being paid their "residuals" from Electronic Commerce, but instead is paid by OFI SAAS.

192.    Plaintiff is informed and believes, and based thereon alleges, that since about March 2020, Electronic Commerce's employees are paid by OFI SAAS.

193.    Plaintiff is informed and believes, and based thereon alleges, that since about June 2020, the independent sales representatives that refer merchants to Electronic Commerce have been directed by Ponder, Lakatos, Neuroth and others, that all new merchant contracts must be submitted to Tangram and not Electronic Commerce.

194.    Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth is redirecting money from Electronic Commerce's settlement account at First Data, to accounts under the control of Tangram, OFI SAAS, LLC, or other entities under the control of Defendants.

195.    Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth engaged without the consent of Plaintiff, a business broker, "Portfolio Buyer," to sell Electronic Commerce assets.

PACHECO & NEACH PC
P&N

196.     On or about June 16, 2021, CBCal sent Notice of Termination and Notice of Updated Company Reserve Requirements letter ("Termination Notice") to Electronic Commerce.  Ponder, Lakatos and Neuroth failed and refused to send the Termination Notice to Plaintiff or make him aware of its existence for several weeks after it was received.

197.     The Termination Notice states that termination of the MMPA will take effect on December 20, 2021. CBCal also requested in the Termination Notice that it "repeats its demands that Electronic Commerce (i) fully comply with the TPPP Guidelines in force, (ii) fully comply with the Fraud Action Plan requirements, (iii) close and cease processing for all merchants onboarded on transacting which is inconsistent with CBCal's policies and requirements, and (iv) fully comply with all past and future requests and instructions given by CBCal."

198.     Plaintiff is informed and believes, and based thereon alleges, that Ponder, Lakatos and Neuroth have deliberately operated Electronic Commerce out of compliance with the MMPA and CBCal's policies so that CBCal would terminate the MMPA, and they could transfer Electronic Commerce's merchants to Tangram.

199.     On or about June 30, 2021, CBCal sent a letter to Electronic Commerce regarding reserve account calculations notifying Electronic Commerce that pursuant to the MMPA and the Termination Notice that Electronic Commerce must increase the amounts it holds in reserve.

200.     Because CBCal has given the Termination Notice, Electronic Commerce has until December 20, 2021, to either transfer its business to a new sponsoring bank or to resolve its issues with CBCal such that it will rescind the Termination Notice.

201.     Plaintiff is informed and believes, and based thereon alleges, that receiving the Termination Notice, Ponder, Lakatos and Neuroth have continued to sign up new customers with Tangram rather than Electronic Commerce.

202.     Plaintiff is informed and believes, and based thereon alleges, that sales representatives are being directed by Ponder, Lakatos and Neuroth that any new merchants that they attempt to enter into credit card processing agreements for Electronic Commerce must be signed up as Tangram customers, not Electronic Commerce.

203.   On July 20, 2021, Judge Gregory Lewis of the Superior Court of the State of California for the County of Orange, entered the Order Granting Plaintiff's Ex Parte Application for Temporary Restraining Order (the "TRO").

204.   On July 21, 2021, Plaintiff sent an email to Ponder with a copy of the TRO and requesting compliance and access to Electronic Commerce's books and records.  Ponder did not grant Plaintiff access and still has failed and refused to do so.

205.   On July 22, 2021, Plaintiff and his counsel, Rod Pacheco, were prevented from entering Electronic Commerce's offices after presenting the TRO to Ponder, Lakatos and Neuroth and others, and were not given access to any of the books and records of Electronic Commerce.

206.   Ponder, denied Plaintiff access to Electronic Commerce's offices despite stating in a declaration under penalty of perjury that: "Electronic Commerce, LLC's current operations consist of only servicing existing merchant accounts, monitoring risk, pursuing debts, and protecting the existing revenue stream. All of these functions are performed by me and the staff that I pay for under a separate entity, Ecommerce SAAS, LLC dba "Tangram Payments.""

207.   On August 9, 2021, the Court in California denied Plaintiff's request for a preliminary injunction refusing to exercise jurisdiction over the case.

208.   On August 19, 2021, counsel for Plaintiff sent a letter to Portfolio Buyer demanding that it cease and desist any marketing of and attempts to sell Electronic Commerce assets.

209.   Plaintiff is informed and believes, and based thereon alleges, that numerous merchants and their attorneys have submitted complaints to Electronic Commerce and CBCal about Electronic Commerce's conduct, including improper termination of contracts, excessive termination fees, refusal to return reserves, reserve accounts with less money that merchants believes should be there, and failure to allow merchants to process returns and chargebacks for customers.

### FIRST CAUSE OF ACTION

### (Fraud – Against All Defendants)

210.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

211.    At all relevant times, Ponder was an officer and/or a controlling member of Electronic Commerce.

212.    At all relevant times, Lakatos was an officer of Electronic Commerce.

213.    At all relevant times, Neuroth was an officer of Electronic Commerce

214.    As herein alleged, Defendants formed a conspiracy to steal the assets of Electronic Commerce for their own benefit and deprive Plaintiff of the benefits of his ownership interests in Electronic Commerce.

215.    In furtherance of that conspiracy, Defendants engaged in numerous fraudulent and deceitful acts, including, among others: (1) The submission of knowingly false information and/or altered documents to CBCal in conjunction with its evaluation of  Electronic Commerce's merchants; (2) The formation and presentation of Tangram as a legitimate competitor of Electronic Commerce, which was, and is, untrue; (3) The concealment of Defendant Lakatos's employment with Electronic Commerce while still employed at CBCal; (4) The concealment of the formation of various entities, and of the true nature of those entities, into which Electronic Commerce's stolen assets were stashed and through which Defendants attempted to launder said funds; (5) The concealment of alterations to Electronic Commerce's contractual documents with the intent of stealing funds from the reserve accounts of Electronic Commerce's merchants; (6) The use of fake transactions to deplete Electronic Commerce's merchant settlement account; (7) The concealment of the diversion of Electronic Commerce's potential merchant customers to Tangram; and (8) The diversion of revenue generated by Electronic Commerce's merchants from Electronic Commerce to Defendants.

216.    Defendants acted with knowledge that their conduct was wrongful, that the information and/or documents supplied was false, and/or that they had concealed facts that Plaintiff had a right to know.

217.   Defendants intended to induce Plaintiff's reliance on the facts presented to it, and to conceal from Plaintiff the true facts, so that Defendants could divert new customers, transfer existing customers, and divert money from Electronic Commerce to Defendants.

218.   When Plaintiff raised concerns about the onboarding of high risk clients, the relationship with CBCal, the diversion of customers to Tangram, the payment of funds to third parties with no benefit to Electronic Commerce, Ponder, Lakatos, Neuroth and those under their supervision told Plaintiff that it was under control, that the situation was being handled.

219.   When Plaintiff raised concerns about merchants complaining about confiscation of their reserves, he was told by Ponder, Lakatos, Neuroth and those acting under their supervision that the merchant complaints were being addressed.

220.   When Plaintiff raised concerns about the imposition of an "inactivity fee" and the increase of the "termination fee" in the terms of conditions for merchant contracts, Plaintiff was told by Ponder, Lakatos, Neuroth and those acting under their supervision that these fees were appropriate, that he did not understand operations, and that CBCal's concerns about these fees were being addressed.

221.   Plaintiff reasonably relied on the facts and information Defendants presented to him and had no knowledge of the true facts concealed from it.

222.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered monetary damages in a sum that cannot be determined with certainty at this time. Plaintiff prays for, and if necessary, will seek, leave to amend this complaint to allege the amount of damages when said amount is determined.

223.   In carrying out the acts alleged herein, Defendants acted maliciously and oppressively, in that they intended to cause injury to Plaintiff and/or engaged in despicable conduct carried out with a willful and conscious disregard of Plaintiff's rights, and Defendants acted fraudulently, in that they engaged in the misrepresentations, deception, and concealment of material facts and/or information with the intent causing Plaintiff injury and/or depriving him of his property and/or rights. Defendants is therefore liable to Plaintiff for punitive damages.

**SECOND CAUSE OF ACTION**

**(Intentional Interference with Contractual Relations – Against All Defendants)**

224.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

225.    As alleged herein, Electronic Commerce and Electronic Commerce entered into the MMPA.   Defendants knew that CBCal and Electronic Commerce were parties to an ongoing contractual relationship.

226.    Defendants formed a conspiracy to disrupt and/or destroy the relationship between CBCal and Electronic Commerce for their own financial benefit. As alleged herein, the conspiracy was designed to allow Defendants to steal Electronic Commerce's assets—including not only cash, but also business opportunities, employees and more—while at the same time creating liabilities for Electronic Commerce through the theft of merchant funds and the use of fraudulent transactions to improperly deplete the merchant reserve account. Defendants knew, at all relevant times, that Electronic Commerce would and will be responsible for certain liabilities and intentionally depleted Electronic Commerce's assets, including its reserve account, to leave CBCal with insufficient funds on deposit to cover said liabilities.

227.    Defendants, to the extent they were corporate agents or employees of Electronic Commerce, were not acting for or on behalf of Electronic Commerce when taking the actions alleged herein, but, rather, were acting for or on behalf of Tangram and for its and their financial benefit. Furthermore, the Defendants who is or were owners, directors, and/or officers of Electronic Commerce were acting for their own personal benefit, not that of Electronic Commerce, in taking the actions alleged herein.

228.    Defendants intended to interfere with the contractual relationship between CBCal and Electronic Commerce—said disruption being a necessary and unavoidable result of Defendants' conspiracy—and acted with knowledge that such interference would result from their conduct. As herein alleged, Defendants' conduct substantially disrupted the contractual relationship between CBCal and Electronic Commerce for many months and ultimately caused CBCal to terminate the MMPA.

229.    Prior to Defendants' fraudulent actions, Electronic Commerce had performed its obligations under the MMPA and were it not for Defendants' conspiratorial interference Electronic Commerce would have continued to do so.

230.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered monetary damages in a sum of at least $10,000,000.

231.    In carrying out the acts alleged herein, Defendants acted maliciously and oppressively, in that they intended to cause injury to Plaintiff and/or engaged in despicable conduct carried out with a willful and conscious disregard of Plaintiff's rights, and Defendants acted fraudulently, in that they engaged in the misrepresentations, deception, and concealment of material facts and/or information with the intent causing Plaintiff injury and/or depriving it of its property and/or rights. Defendants are therefore liable to Plaintiff for punitive damages.

### THIRD CAUSE OF ACTION

### (Interference with Prospective Economic Relations – Against All Defendants)

232.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

233.    Plaintiff derived an economic benefit from its contractual relationship with CBCal, and were it not for Defendants' tortious actions, Plaintiff would have continued to derive that benefit in the future.

234.    Defendants knew that there was an ongoing economic relationship with CBCal, and, as herein alleged, Defendants conspired to disrupt and/or destroy that relationship for their own personal financial benefit. The acts of Defendants, in so doing, were independently wrongful.

235.    As herein alleged, Defendants' conduct substantially disrupted the economic relationship between CBCal and Electronic Commerce for many months and ultimately caused CBCal to terminate the MMPA.

236.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered monetary damages in a sum of at least $10,000,000.

237.    In carrying out the acts alleged herein, Defendants acted maliciously and oppressively, in that they intended to cause injury to Plaintiff and/or engaged in despicable conduct

carried out with a willful and conscious disregard of Plaintiff's rights, and Defendants acted fraudulently, in that they engaged in the misrepresentations, deception, and concealment of material facts and/or information with the intent causing Plaintiff injury and/or depriving it of its property and/or rights. Defendants is therefore liable to Plaintiff for punitive damages.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against Defendants Lakatos and Neuroth)

238.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

239.    At all relevant times, Lakatos was an officer of ELECTRONIC COMMERCE.

240.    At all relevant times, Neuroth was an officer of ELECTRONIC COMMERCE

241.    As officers of Electronic Commerce, Lakatos and Neuroth owed Electronic Commerce and its members, including Plaintiff fiduciary duties of loyalty, care, honesty, and a duty to discharge their duties in good faith, with the care an ordinary prudent person in a like position would exercise, and in a manner, he reasonably believed to be in Electronic Commerce's and Plaintiff's best interests. Lakatos and Neuroth were in positions of trust with Electronic Commerce and its members.

242.    Lakatos and Neuroth each owed members of Electronic Commerce, including Plaintiff, the fiduciary duty to subordinate their own self-interests to those of Electronic Commerce and its members. Each of the Lakatos and NUEROTH, at all relevant times, knew of their duties to Electronic Commerce and its members, including Plaintiff.

243.    Lakatos and Neuroth each had a duty to act in the best interests of Electronic Commerce and its members and to preserve their assets for the benefit of its members, including Plaintiff.

244.    Lakatos and Neuroth each had a duty of loyalty to abstain from self-dealing and the pursuit of personal interests not shared by Electronic Commerce and its members, including Plaintiff.

245.    Tangram is owned by Marque Trust and Lakatos is either the trustee of Marque Trust, a beneficiary of Marque Trust, is directly related to the Marque Trust, or employed by Marque Trust.

As such, Lakatos was interested in transactions authorized and directed which did or were intended to benefit Lakatos's interest at the expense of Electronic Commerce and Electronic Commerce's co-member Plaintiff. As such Lakatos and the remaining Defendants were interested in any transactions which did or were intended to benefit members' interests at the expense of Electronic Commerce and Plaintiff.

246. Lakatos and Neuroth breached their fiduciary duties by affirmatively leading Electronic Commerce and Plaintiff to believes that they continued to devote their full time, energy, and attention to his duties for Electronic Commerce. In fact, Lakatos and Neuroth devoted less than their full time, energy, and attention to their duties for Electronic Commerce and were instead devoting time, energy, and attention to competing with Electronic Commerce by directing business opportunities to themselves and their other businesses, including Tangram.

247. Plaintiff is informed and believes, and based thereon alleges, that Lakatos and Neuroth used Electronic Commerce assets and monies to purchase capital equipment for the use and benefit of Tangram and his other businesses.

248. Plaintiff is informed and believes, and based thereon alleges, that Lakatos and Neuroth used Electronic Commerce employees for the benefit of Tangram and their other businesses.

249. Plaintiff is informed and believes, and based thereon alleges, that Lakatos and Neuroth diverted business opportunities from Electronic Commerce to Tangram and their other businesses and otherwise directly competing against Electronic Commerce.

250. Plaintiff is informed and believes, and based thereon alleges, that Lakatos and Neuroth diverted corporate assets from Electronic Commerce to themselves and their other businesses.

251. At various times, defendants Does 1 through 20, became aware of Lakatos's and Neuroth's breaches of his duties to Electronic Commerce and Plaintiff as described herein and otherwise. Defendants' actions in this regard were undertaken pursuant to a conspiracy formed between Defendants, which conspiracy contemplate the appropriation and misuse of Electronic Commerce's assets and resources to advance and pursue the business enterprises of Lakatos and

Neuroth and their other businesses, including Tangram, through the misleading actions, omissions, and concealments described herein.

252.    At various times after formation of the initial conspiracy, those of the Defendants who were not part of the initial conspiracy joined in that conspiracy and agreement and related acts described above. As they learned of and joined in the conspiracy, each of the Defendants ratified prior actions and agreed to actions undertaken thereafter.

253.    As a result of Lakatos's and Neuroth's breaches of his fiduciary duties to Electronic Commerce and Plaintiff, Electronic Commerce and Plaintiff have been damaged in an amount, the precise sum of which is not presently ascertainable, but which will be proven at trial, and which Plaintiff presently believes, and based thereon alleges, to be not less than $10,000,000.

254.    As a result of Lakatos's and Neuroth's breaches of his duties, they have been unjustly benefitted and enriched through his misappropriation of Electronic Commerce's and Plaintiff's assets and resources and other wrongful conduct described herein.

255.    Lakatos and Neuroth committed the acts alleged herein maliciously, oppressively, and/or fraudulently under California Civil Code section 3294, meaning Lakatos' and Neuroth's conduct (a) was intended by them to cause injury to Electronic Commerce and Plaintiff or was despicable conduct carried on by Lakatos and Neuroth with a willful and conscious disregard of the rights or safety of others; (b) was despicable conduct that subjected Electronic Commerce and Plaintiff to cruel and unjust hardship in conscious disregard of Electronic Commerce and Plaintiff's rights; and/or (c) amounted to intentional misrepresentation, deceit, or concealment of material information with the intention on Defendants' part of depriving Electronic Commerce and Plaintiff of property or rights otherwise causing Electronic Commerce and Plaintiff injury. Accordingly, Lakatos' and Neuroth's conduct warrants the assessment of punitive damages.

## FIFTH CAUSE OF ACTION

### (Conversion – Against All Defendants)

256.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

257.    In committing the wrongful acts hereinabove alleged, Defendants, and each of them, seized and converted to their own uses and benefits monies, property, records, files, information, and materials of Plaintiff. The full extent of the monies, property, records, files, information, and materials seized by Defendants is not presently known to Plaintiff but is fully known to Defendants.

258.    As alleged herein, Defendants, working in concert, have transferred the employees, books, and records, leased office space, customers, and monies from Electronic Commerce to Tangram, Ecommerce SAAS, OFI SAAS, 488 Club and other related entities in which Defendants have an interest.

259.    Despite Plaintiff's demands, Defendants, and each of them, have failed and refused to return said property, records, files, information, and materials to Plaintiff, and have withheld the same from Plaintiff, exercising full dominion and control for their own uses and benefits and in conscious and intentional disregard for Plaintiff's rights.

260.    As alleged herein, Defendants, working in concert, used Electronic Commerce assets, employees, and money to obtain an agreement from Bancorp to be the sponsoring bank for Tangram.

261.    Plaintiff is presently entitled to sole possession, custody and control of his interest in the property, records, files, information, and materials being withheld and used by Defendants.

262.    As a direct and proximate result of the conversion of said property, records, files, information, and materials, Plaintiff has suffered, and continues to suffer, damages in amounts of at least $10,000,000.

**SIXTH CAUSE OF ACTION**

**(Unfair Competition in Violation of California Business & Professions Code Section 17200 – Against All Defendants)**

263.    Plaintiff incorporates by reference as though fully set forth herein the allegations in Paragraphs 1 through 209 of this Complaint.

264.    Defendants engaged in a variety of conduct toward Plaintiff that constitutes unlawful, unfair, and fraudulent business practices in violation of the California Business and Professions

—

Code section 17200, including without limitation: (a) interfering in Plaintiff's ownership rights of Electronic Commerce and Plaintiff's prospective economic advantage with existing and prospective customers of Electronic Commerce, by diverting credit card processing opportunities and other joint ventures to Ecommerce SAAS, OFI SAAS, Tangram and other businesses owned or controlled by Defendants; (c) improperly using Electronic Commerce's confidential information to solicit business for Ecommerce SAAS, OFI SAAS, Tangram and other businesses owned or controlled by Defendants that should have gone to Electronic Commerce; (d) breaching fiduciary and other duties owed to Plaintiff; (e) illegally copying and destroying files; and (f) using Electronic Commerce's employees and organization for the purpose of having them participate in Defendant's scheme to divert from Electronic Commerce business and revenue to Ecommerce SAAS, OFI SAAS, Tangram and other businesses owned or controlled by Defendants.

265.    Defendants took the actions alleged herein with the intent to injury Plaintiff, to gain an unfair competitive advantage, and to diminish competition.

266.    Defendants profited and will, in the future, profit unjustly from his unfair business practices. Accordingly, pursuant to California Business and Professions Code section 17203, Plaintiff seeks an award of restitution and disgorgement.

267.    As a proximate result of Defendant's conduct, Plaintiff has been and will continue to be damaged. Unless enjoined by this Court, Defendant's unlawful competition has and will continue to cause great and irreparable injury to Plaintiff.  Plaintiff has no other adequate remedy at law for such acts and threatened acts. Plaintiff therefore requests, pursuant to Business and Professions Code section 17203, that during the pendency of this action, this Court issue a preliminary injunction, and that after trial, this Court issue a permanent injunction, restraining and enjoining Defendants and their agents, employees, attorneys and representatives, and anyone acting at their direction, from engaging in the unlawful, unfair, and fraudulent business practices alleged herein.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.  For the equitable relief requested in this Complaint;

2.  Injunctive relief;

3.  For general damages, plus interest, according to proof at trial, but in an amount not less than $10,000,000;

4.  For exemplary and punitive damages according to proof;

5.  For restitution and disgorgement of all profits in amount sufficient to force Defendants to disgorge all ill-gotten gains;

6.  For punitive damages according to proof at trial;

7.  For reasonable attorneys' fees and costs, as permitted by law;

8.  For an accounting;

9.  For a constructive trust;

10. For expenses and costs of suit incurred;

11. For prejudgment interest and pre-trial interest, according to proof; and

12. For such, further, and different relief as the Court may deem just and proper.

DATED: August 30, 2021

PACHECO & NEACH, P.C.

/s/ ERIC J. FROMME
Rod Pacheco
Brian Neach
Eric J. Fromme
Attorneys for Plaintiff